UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | HON. JOSHUA D. WOLSON |
| | : | |
| v. | : | CRIM. NO. 20-392 |
| | : | |
| | : | **UNDER SEAL** |
| NABILA KHAN | : | |

SENTENCING MEMORANDUM ON BEHALF OF NABILA KHAN

Defendant, Nabila Khan, by her attorney, Caroline Goldner Cinquanto, Esq.,

hereby submits the following memorandum in mitigation of sentence in the above

captioned matter.

I.      INTRODUCTION

Had it not been for her brothers' radicalization, there is no doubt that Nabila

Khan would now be a proud, law-abiding citizen of the United States – a country she

has grown to love and respect since she immigrated here in 2005.   While her dreams

may have been simple – raise her children, support her husband, and become a citizen –

they were honorable.

Those dreams are now shattered.  Soon, the Khan-Gaffar children will lose their

mother to prison or deportation or both.  Shahidul Gaffar will lose his business and the

family's sole source of income.  And Ms. Khan will be deported to Bangladesh –

penniless, childless, and broken.  These outcomes are not a possibility, they are reality.

It is important to emphasize at the outset that Ms. Khan never supported ISIS and its beliefs. She supported her brothers after they had made irreversible, catastrophically bad decisions. The government is sure to argue that this is a distinction without a difference; however, the defense respectfully disagrees. It is one thing to support ISIS and its mission, it's another thing entirely to provide support for siblings in times of crisis.

II      NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE PERSONAL CHARACTERISTICS OF NABILA KHAN

Ms. Khan was raised in Bangladesh. She has an 8th grade education. In 2005, when she was twenty years old, she married her husband, Shahidul, in an arranged marriage. She emigrated to the United States shortly thereafter in 2006. Ms. Khan admits that the move to the United States was difficult, primarily due to cultural and social differences.

Since her arrival in the United States, Ms. Khan has led an isolated exitance. While she enjoys the company of her children and husband, she has few friends. She does not drive. She does not work outside the home. The family has few financial resources for many social or extracurricular activities.

Despite this, Ms. Khan has built a happy life in the United States. While her husband works tirelessly to support his family, Ms. Khan focuses on raising their four children: Bushra (age 13), Zaara (age 11), Yusef (age 6), and Yasir Gaffar (age 3). By all accounts, with the exception of her actions in this case, for the past fifteen years Ms. Khan has lived a law-abiding, honest, hardworking life.

a.      **Relationship with Ibrahim**

In 2013, Ms. Khan's brother, Ibrahim, came to the United States on a student visa. Originally, Ibrahim lived in New York where he attended community college; however, in June 2014, Ibrahim moved to Pennsylvania to be near Ms. Khan and her family. Shortly after arriving in Pennsylvania, Ibrahim began classes at Montgomery County Community College and started working with Shahidul Gaffar at his restaurant. It was during this time that Ibrahim began a romantic relationship with a young woman. He fell in love, she broke his heart, and Ibrahim began to withdraw physically and emotionally from the family. As he mourned the loss of his relationship, Ibrahim gradually became radicalized in his basement bedroom, unbeknownst to Ms. Khan or her husband.

In February 2015, Ibrahim returned to Bangladesh and in July 2015, he departed for Syria to fight in support of ISIS. Prior to his departure, Ms. Khan offered both financial and emotional support, in the form of a small amount of cash and encouraging Facebook messages. ████████████████████████████████████████

████████████████████████████ ██████████████████████████

████████████████████████████████████████████

████████████████████████

**b.    Relationship with Junaid**

Ms. Khan's brother, Junaid, became radicalized in Bangladesh while Ms. Khan was living in the United States. Upon hearing that Junaid was going to travel to Syria, Ms. Khan offered to sell some gold-plated jewelry to provide him with money. She

then traveled to Bangladesh to say goodbye.  Ms. Khan's last contact with Junaid was in 2015.  As of today, she is unaware if he is dead or alive.

It is impossible for anyone to place themselves in Ms. Khan's position during this time.  Her family was in crisis.  Two brothers had made decisions that would likely lead to their certain death.  It was in *this* context that Ms. Khan decided to ostensibly support their decisions, rather than to alienate them.





**b.      Collateral Consequences of Conviction**

No matter what sentence the Court imposes, Ms. Khan is going to lose everything – her children, her husband, her livelihood.  She will be deported back to a country which the United Nations and human rights groups have criticized for its abuses against women and children[1],  discriminatory health care[2],  and lack of free speech and association[3].  The defense respectfully requests that the Court consider this fact when imposing sentence by granting a downward variance.

---

[1] According to a Bangladesh human rights organization, Ain O Salish Kendra, women and girls face widespread violence in Bangladesh.  Despite promises, the government has failed to pass a long overdue sexual harassment law, make amendments to the discriminatory rape law, or prohibit all marriages for girls under 15.
Human Rights Watch, https://www.hrw.org/world-report/2021/country-chapters/bangladesh#5d204e

[2] Doctors told Human Rights Watch that they were overwhelmed and under pressure to reserve limited intensive care facilities for patients with clout or influence. Delivery of essential sexual and reproductive health services fell to the wayside, putting women and girls' health at increased risk.
Human Rights Watch, https://www.hrw.org/world-report/2021/country-chapters/bangladesh#5d204e

[3] In October 2018, the Bangladeshi Government implemented the Digital Security Act (DSA) which allows police officers to detain people without a warrant.  The act, which was opposed by members of the media, the opposition Jatiya Party, and human rights organizations, has been utilized to harass and indefinitely detain activists, journalists, and others critical of the government and its political leadership. The international community, including the UN High Commissioner for Human Rights, UN independent experts, and European Union, as well as journalists in Bangladesh repeatedly have criticized the DSA for stifling free speech and violating international law.   In addition, the government has used the Covid-19 pandemic as pretext to censor free speech, the media, and threaten academic freedom, arresting artists, students, doctors, political opposition members, and activists for speaking out about the government's handling of the pandemic.
Human Rights Watch, https://www.hrw.org/world-report/2021/country-chapters/bangladesh#5d204e

The PSR concurs that a sentence below the guideline range may be appropriate for this same reason stating, "[a]lthough the Court is already limited because of the statutory maximum term of imprisonment of 60 months, the Court may wish to consider a further reduction in sentence in light of the potential collateral consequences of her conviction, namely, the likelihood that she will be deported." PSR, P. 29, ¶123.

### c. Negative Effect of Pretrial Publicity

After Ms. Khan's guilty plea, the government issued a press release which was quickly picked up by news outlets around the world. The consequences have been devastating. Acquaintances and business contacts in this country have shunned them. And Ms. Khan and Shahidul have lost contact with most of their family and friends overseas due to the constant harassment they have suffered in Bangladesh.

The unnecessary publicity will continue to have long-lasting negative effects, especially for Ms. Khan who will eventually be deported to Bangladesh, a country which metes out severe punishment for any form of terrorist support.

### d. Post Offense Rehabilitation

The Supreme Court in *Gall vs. United States*, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007) affirmed a downward variance for post-offense rehabilitation. It has been nearly four years since Ms. Khan provided support to her brothers. In the ensuing four years, without being charged or at the direction of counsel, Ms. Khan has continued to live a law-abiding life in the United States. She has continued to raise her children. Her

husband has continued to work. For charges as serious as the ones at hand, there is little, if any, concern that Ms. Khan is a threat to her community specifically, or the United States in general.



IV.     DEFENSE SENTENCING RECOMMENDATION

Based upon the above, the defense respectfully requests that the Court impose a sentence one day incarceration followed by a period of nine months home confinement.

V.      REQUEST TO FILE MOTION UNDER SEAL

Based upon the nature of the information provided in this Sentencing Memorandum ████████████████ undersigned counsel respectfully requests that this Memorandum be filed under seal.  A proposed form of sealing order is attached.

Respectfully submitted,

*/s/ Caroline Goldner Cinquanto*
The Law Firm of Caroline Goldner Cinquanto
Two Greenwood Square
1331 Street Road, Suite 450
Bensalem, PA  19020
Office:  215.910.2732; Email:  carrie@cgclegal.com

Date:  September 3, 2021

<u>CERTIFICATE OF SERVICE</u>

I, Caroline Goldner Cinquanto, Esquire, certify that I have caused to be delivered

a copy of this Sentencing Memorandum upon the following parties on this date:

Sarah Wolfe, Esq.
Robert Livermore, Esq.
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

<u>*/s/ Caroline Goldner Cinquanto*</u>
Caroline Goldner Cinquanto, Esquire

Date:  September 3, 2021

UNITED STATES DISTRICT COURT